**METRO TRANSPORTATION CO., t/a Yellow Cab Company, Official Creditors' Committee, Pennsylvania Public Utility Commission**

v.

**NORTH STAR REINSURANCE CO., Underwriters at Lloyd's of London, Northwestern National Insurance Company**

v.

**REPUBLIC HOGG ROBINSON OF PENNSYLVANIA, INC., f/k/a The Wirkman Company, H & W Underwriters.**

**Appeal of Henry Ralph ROKEBY-JOHNSON, as Representative Underwriter of Those underwriters Subscribing to Certificate # 272, 1489, improperly designated as Underwriters at Lloyd's of London, Appellant in No. 89–2007, Appellee in Nos. 89–2008 and 89–2009.**

**Appeal of NORTHWESTERN NATIONAL INSURANCE COMPANY, Appellant in No. 89–2008, Appellee in Nos. 89–2007 and 89–2009.**

**Appeal of NORTH STAR REINSURANCE COMPANY, Appellant in No. 89–2009, Appellee in Nos. 89–2007 and 89–2008.**

Nos. 89–2007 to 89–2009.

United States Court of Appeals, Third Circuit.

Argued April 24, 1990.

Decided Aug. 30, 1990.

Rehearing and Rehearing In Banc Denied Oct. 10, 1990.

Glenn C. Equi (argued), Lori A. Kradzinski, Harvey, Pennington, Herting & Renneisen, Ltd., Philadelphia, Pa., James A. McGuire, III, Mendes & Mount, New York City, for Henry Ralph Rokeby–Johnson, appellant in No. 89–2007 and appellee in Nos. 89–2008 and 89–2009.

Richard M. Jordan (argued), Michael N. Onufrak, White and Williams, Philadelphia, Pa., for Northwestern Nat. Ins. Co. appellant in No. 89–2008, appellee in Nos. 89–2007 and 89–2009.

Andrew C. Hecker, Jr. (argued), Hecker, Brown, Sherry and Johnson, Philadelphia, Pa., for North Star Reinsurance Co. appellant in No. 89–2009, appellee in Nos. 89–2007 and 89–2008.

Kevin W. Walsh (argued), Adelman, Lavine, Gold and Levin, Philadelphia, Pa., for Metro Transp. Co., appellee in Nos. 89–2007, 89–2008 and 89–2009.

William G. Downey (argued), James H. Pickering, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for The Official Committee of Unsecured Creditors, appellee in Nos. 89–2007, 89–2008 and 89–2009.

John F. Povilaitis, Chief Counsel, H. Kirk House, Deputy Chief Counsel, Alan Kohler (argued), Asst. Counsel, Pennsylvania Public Utility Com'n, Harrisburg, Pa., for Pennsylvania Public Utility Com'n appellees in Nos. 89–2007, 89–2008 and 89–2009.

Before BECKER, GREENBERG and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

Metro Transportation Company ("Metro"), a taxi company in Philadelphia that has filed in bankruptcy under Chapter 11 of the Bankruptcy Code (11 U.S.C. § 1101 *et seq.*) brought this action for declaratory judgment in the Eastern District of Pennsylvania to determine whether the liability for third party claims against Metro must be borne by the bankrupt debtor or by three insurance companies ("Insurance Companies"), Underwriters at Lloyd's of London, Henry Ralph Rokeby–Johnson as representative ("Lloyd's"), North Star Reinsurance Corp. ("North Star"), and Northwestern National Insurance Company ("Northwestern") under certain automobile insurance contracts.[1]

The Official Committee of Unsecured Creditors of Metro ("Unsecured Creditors") and the Pennsylvania Public Utility Commission ("PUC"), were granted leave to proceed as intervenor-plaintiffs in this action. Metro, the insurance companies, PUC and the Unsecured Creditors all filed motions for summary judgment. The district court granted summary judgment in favor of Metro and PUC, and held the insurance companies liable for assorted claims.

I

In every appeal we must first be satisfied that this court has appellate jurisdiction. Indeed, the Supreme Court has admonished the courts of appeals that this must be a threshold inquiry, particularly if jurisdiction is not apparent. *Goodyear Atomic Corporation v. Miller*, 486 U.S. 174, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988) ("Although neither party contests our appellate jurisdiction over this case, we must independently determine as a threshold matter that we have jurisdiction"); See also *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 104 S.Ct. 1723, 80

---

1. The case originally proceeded in bankruptcy court, but was transferred to the district court when the bankruptcy court took the position that a jury trial might be needed and the bankruptcy court stated that it was not authorized to conduct such trial. The issue as to whether a bankruptcy court may conduct a jury trial has yet to be decided by this court, and has been reserved by the Supreme Court in *Granfinanciera, S.A. v. Nordberg*, — U.S. —, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). The Second Circuit recently ruled that jury trials by the bankruptcy courts are permitted; see *In re Ben Cooper* 896 F.2d 1394 (2d Cir.), *cert. granted,* — U.S. —, 110 S.Ct. 3269, 111 L.Ed.2d 779 (1990). The Eighth Circuit has stated its disagreement with this rule; *In re United Missouri Bank Of Kansas City,* 901 F.2d 1449 (8th Cir. 1990).

L.Ed.2d 196 (1984); *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Where counsel has not satisfied us that jurisdiction is present, we are obliged to raise that issue on our own initiative. Such is the case here.

### A.

At oral argument we raised questions concerning the statutory bases for our jurisdiction, the applicability of Fed.R.Civ. Proc. 54(b) to bankruptcy proceedings and whether the order from which the present appeals were taken was final. We also questioned whether the certification by the district court pursuant to Rule 54(b) if applicable, complied with the mandate of *Allis–Chalmers v. Philadelphia Electric Co*, 521 F.2d 360 (3rd Cir.1975).

To resolve these questions, we sought supplemental briefing from the parties. Essentially we sought to determine if we could exercise jurisdiction over an appeal based upon the well established rules codified in 28 U.S.C. §§ 1291–1292, or if our jurisdiction over a bankruptcy appeal is governed by 28 U.S.C. § 158(d),[2] or both.

### B.

■ In the present appeal, we are reviewing a district court ruling where no bankruptcy court has ever ruled on the relevant issue, and therefore no appeal has been taken under 28 U.S.C. § 158(a) from the bankruptcy court to the district court and then to this court under § 158(d). As we observed in note 1 *supra*, jurisdiction in this case was transferred without a ruling of the bankruptcy court to the district court prior to trial. Thereafter the issue of liability was decided solely by the district court under its bankruptcy powers pursuant to 28 U.S.C. § 1334[3] and not as a result of an appeal under § 158(a).

As we stated in *U.S. v. Nicolet, Inc.*, 857 F.2d 202, 204 (3d Cir.1988):

> Here, however, no bankruptcy judge's order was challenged; the original order appealed from was entered by the district court. Consequently section 158(d) is not an available predicate for jurisdiction.

This result illustrates the gap existing in the procedure Congress created to govern bankruptcy appeals. Section 158(a) grants the district courts appellate authority over rulings entered by bankruptcy judges. Additional review in the courts of appeals of the district judges' appellate disposition is then explicitly authorized in section 158(d). However, no provision addresses the courts of appeals' authority to review orders entered by the district court in their non-appellate bankruptcy role. Therefore, the only available review of original orders entered by the district court lies under the general appeal provision, 28 U.S.C. § 1291.

Similar analyses can be found in *In re Bishop*, 856 F.2d 78 (9th Cir.1988) and *In re Louisiana World Exposition*, 832 F.2d 1391 (5th Cir.1987).

■ Although this case arises under § 1291 rather than § 158(d), "we have consistently considered finality in a more pragmatic and less technical way in bankruptcy cases than in other situations." *In re Amatex*, 755 F.2d 1034, 1039 (3rd Cir.1985). In *Nicolet* as well, we held that "in the bankruptcy setting present in this case, our section 1291 jurisdiction mirrors that under section 158(d)." We recently reaffirmed, in *In re Pruitt*, 910 F.2d 1160 (3rd Cir.1990),

---

**2.** 28 U.S.C. § 158(d) states:

The courts of appeals shall have jurisdiction of appeals from all final decisions, judgments, orders, and decrees entered under subsections (a) and (b) of this section.

Subsections (a) and (b) establish the right to appeal from bankruptcy court decisions to the district court or to Bankruptcy Appellate Panels. Only the Ninth Circuit has authorized Bankruptcy Appellate Panels.

**3.** 28 U.S.C. § 1334 states in relevant part:

(a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under Title 11.

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under Title 11.

that in the bankruptcy context the concept of finality should be viewed functionally. *See* at 1165. "Nonetheless," we warned, "our relaxed view of bankruptcy orders cannot import appellate jurisdiction without some vestige of finality." *Id.*

Accordingly, to vest jurisdiction in this court where the district court has not disposed of all parties and issues, and absent an appealable injunctive order under 28 U.S.C. § 1292(a), either certification under 28 U.S.C. § 1292(b) must be granted by the district court and by this court, or a Rule 54(b) certification complying with *Allis–Chalmers* must be ordered, or, in the bankruptcy context, we must be satisfied that the particular adversarial dispute has been resolved to a sufficient degree of finality.[4]

### C.

In *Allis–Chalmers Corp. v. Philadelphia Electric Co.*, 521 F.2d 360, 363 (3d Cir.1975) we insisted that the district court provide us with reasons adequate to support a Rule 54(b) certification.

> A proper exercise of discretion under Rule 54(b) requires the district court to do more than just recite the 54(b) formula of "no just reason for delay." The court should clearly articulate the reasons and factors underlying its decision to grant 54(b) certification. "... It is essential ... that a reviewing court have some basis for distinguishing between well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors, and mere boiler-plate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law...."

*Protective Committee v. Anderson*, 390 U.S. 414, 434, 88 S.Ct. 1157, 1168, 20 L.Ed.2d 1 (1968).

We are not alone in establishing these requirements for a Rule 54(b) order. Since *Allis–Chalmers*, other courts of appeals

have adopted this requirement; *Pahlavi v. Palandjian*, 744 F.2d 902 (1st Cir.1984); *Arlinghaus v. Ritenour*, 543 F.2d 461 (2d Cir.1976); *Rothenberg v. Security Management Co., Inc.*, 617 F.2d 1149 (5th Cir.1980); *Solomon v. Aetna Life Insurance Co.*, 782 F.2d 58 (6th Cir.1986); *United States General, Inc., v. Albert*, 792 F.2d 678 (7th Cir.1986); *Hayden v. McDonald*, 719 F.2d 266 (8th Cir.1983).

### D.

■ When this matter first came before us on appeal, the district court had certified its order under Rule 54(b), but without articulating any reason for its certification. As a result, rather than returning jurisdiction to the district court, we ordered a partial remand to provide the district court with an opportunity to comply with our *Allis–Chalmers* mandate. On remand, however, the district court declined to recertify the issue under Rule 54(b). Instead, it ordered

> that the Interlocutory Orders involve a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal may materially advance the ultimate termination of the litigation; and ... that this Court's Memoranda and Orders dated July 7, 1989 and October 24, 1989 are Certified for Appeal pursuant to Title 28 U.S.C. § 1292(b).

On June 16, 1990, we denied leave to appeal pursuant to § 1292(b), but did so once again without prejudice to the district court's reconsideration of its Rule 54(b) certification.

On July 2, 1990 the district court certified its order of July 6, 1989 under Rule 54(b) and provided reasons for its certification. The district court in its order stated:

> Applying the *Allis–Chalmers* criteria to the case at bar reveals: (1) the relationship between the adjudicated claims and the unadjudicated claims does not re-

---

**4.** Other courts of appeals have interpreted the finality requirement found in both § 158(d) and § 1291 differently. *Compare In re Morse*, 805 F.2d 262 (7th Cir.1986) *and In re Vause*, 886 F.2d 794 (6th Cir.1989) *and In re Compton Corp.*, 889 F.2d 1104 (Temp.Emer.Ct.App.1989) *with In re Wood and Locker, Inc.*, 868 F.2d 139 (5th Cir.1989) *and In re Hawaii Corp.*, 796 F.2d 1139 (9th Cir.1986).

quire participation by the plaintiff for disposition of the latter nor are its rights affected by the latter; (2) disposition on appeal of the matters adjudicated on summary judgment will eliminate all coverage issues as to the plaintiff and these issues will never be before this court for review; (3) disposition of the issues presently before the court will facilitate claimants' being able to recover on viable claims without awaiting disposition of the rights and obligations of the insurers *inter se;* and (4) disposition of the coverage matters as to the plaintiff will eliminate the necessity for the plaintiff to participate in further proceedings, thereby preserving assets of the estate of the plaintiff which is presently undergoing reorganization in bankruptcy.

We agree that for the reasons now advanced by the district court our jurisdiction is properly invoked under Rule 54(b). We further note that, while the order appealed from in the present case appears to provide the degree of finality requisite under our *Amatex, Nicolet* and *Pruitt* precedents, we need not reach or address this issue as we are satisfied that we have appellate jurisdiction by virtue of the district court's 54(b) certification.

### E.

■ Our review of an appeal from the grant of a motion for summary judgment is plenary. Where factual controversies exist, disputes over material facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). However, where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, or where the facts are not disputed, there is no genuine issue for trial. *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Thus, where the facts are undisputed, we must determine whether the district court properly analyzed the relevant legal principles governing the dispute.

### II

This appeal arises from, and was a part of, the much larger ongoing bankruptcy of Metro, formerly Yellow Cab, the largest of the companies which provided taxi service to the city of Philadelphia. The issue which confronted the district court, and which we must address, is whether the insurance companies are obligated to pay on behalf of Metro claims which were made against it by third parties and which arose during the period from September 28, 1983 to September 28, 1984.

Essentially, the insurance companies argue that even though Metro was not a valid self-insurer for certain of these claims, the fact that Metro stated itself to be a self-insurer sufficed to allow the insurance companies to escape providing coverage for the statutory minimum. On the other hand, PUC, Metro, and the Unsecured Creditors argue that under Pennsylvania law, the minimum insurance required by statute must be provided, and state law will impute such coverage to all those insurance carriers who issued policies to Metro. Thus Metro argues that even where the insurance policy contains a provision disclaiming such coverage, the insurance carriers are nevertheless liable for the claims.

### A.

On September 28, 1982, Northwestern issued a policy of insurance to Metro, which provided among other coverage that Northwestern was obligated to pay the first $25,000 for which Metro was liable to third party claimants. The policy issued to Metro on September 28, 1982 had an expiration date of September 28, 1983. Northwestern then filed a Uniformed Carrier Bodily Injury and Property Damage Certificate of Insurance ("Form E") with PUC.

A Form E must be filed with the PUC for all taxi companies. Absent a Form E, no common carrier can operate in Pennsylvania. Form E certifies that Metro's taxi operations had adequate automobile insurance coverage conforming to PUC's re-

quirements. Form E also states that the insurance policy—and hence the coverage provided by the policy—cannot be canceled without first giving PUC thirty days notice. Northwestern did not inform PUC of any impending cancellation of its Metro policy, nor did the Form E—as contrasted with the insurance policy—indicate that the policy expired on September 28, 1983.

On September 28, 1983, another contract of insurance, this one between Lloyd's and Metro, was issued by Lloyd's and delivered to Metro. Under the terms of the Lloyd's policy which was entitled "Excess Automobile Liability and Personal Injury Protection [No–Fault] Policy," Lloyd's coverage on behalf of Metro provided up to $325,000 for each occurrence of bodily injury or property damage, but only after the first $25,000 of coverage had been paid by Metro as a self-insurer.

Also on September 28, 1983, North Star issued an insurance policy to Metro. By this policy, North Star agreed to provide automobile liability and no-fault coverage to Metro for $650,000 in excess of the total limits of all other policies. Metro again was to provide for self-insurance for the first $25,000.

### B.

Four additional events occurred after September 28, 1983 that complicate Metro's insurance coverage and that bear on the present dispute. First, on March 27, 1984, approximately six months after the North Star policy was issued, North Star for the first time filed a Form E certifying its insurance coverage with the PUC. North Star also amended its policy to provide automobile insurance coverage to Metro in accordance with regulations of the PUC

pertaining to minimum required liability coverage for motor carriers.

Second, one day later, on March 28, 1984, Northwestern filed a notice of cancellation of its September 28, 1982 policy and revoked its Form E. The Form E revocation and policy cancellation was effective "not less than thirty days after actual receipt of this notice by the Commission" or on April 26, 1984.

Third, on March 28, 1984, Northwestern's policy and its Form E pertaining to that policy were purportedly cancelled retroactively when the PUC stamped on the Form E "This cancellation effective 12:01 A.M. 28th day of September 1983, Pennsylvania Public Utility Commission." This cancellation, if held to be retroactively effective, would have limited Northwestern's liability to claims dated prior to September 28, 1983.[5]

Fourth, Metro filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code on July 29, 1986.

All of Metro's insurers have refused to provide "dollar one" liability coverage for any third party claims which arose from September 28, 1983 to September 28, 1984, claiming that Metro was a self-insurer during this period. Metro filed this action on April 28, 1987, to determine the extent of the insurance companies' liability under their respective insurance policies.

### III

### A.

The district court in granting Metro, PUC and the Unsecured Creditors summary judgment, and in denying the insurance companies' summary judgment motions,[6] held that:

so there wouldn't—Metro wouldn't have to be compelled to pay duplicate insurance coverage if the insurance company insisted that they do that.

**6.** The district court order actually entailed eight separate orders and determinations.

    (1) Northwestern's motion for summary judgment against Metro was denied;

    (2) PUC's motion for summary judgment against Northwestern was granted;

---

**5.** In deposition, Mr. James J. McCarthy, the Chief of the Insurance Division of the Commission's Bureau of Non–Rail Transportation, stated that the reason for the retroactive cancellation was to aid Metro should the insurance companies seek to compel double payment of the insurance premiums. He stated:

    Q: So you canceled it—

    A: We received a filing in March from North Star effective September 28th, '83, and that's the reason we made the filing September 28th, '83,

Metro was not an authorized self-insurer under the laws of Pennsylvania. The PUC did not cancel the Northwestern policy or waive the thirty day cancellation requirement when it stamped the Northwestern policy with an effective cancellation date of September 28, 1983. The statute 52 Pa.Code § 32.2 would not be applied retroactively. Northwestern's notice of cancellation of Metro's insurance policy issued on September 28, 1982 is not effective until March 27, 1984. This Court found that, in addition to the express coverage provided in the respective policies, Northwestern, North Star and Rokeby–Johnson were liable for PIP, Uninsured Motorists claims from $1 to $25,000.

Thus, the district court assigned joint liability for the period from September 28, 1983 to April 26, 1984,[7] to Northwestern, North Star and Lloyd's for the first $25,000 worth of coverage for Personal Injury Protection (PIP), Uninsured Motorist Claims (UM) and Liability Claims. From April 26, 1984 to September 28, 1984, the district court held only North Star and Lloyd's liable.[8]

Liability for the period from September 28, 1983 to September 28, 1984 for the first $25,000 in coverage thus may be summarized as follows:

| Type of claim | PIP Claims | UM Claims | Liability Claims |
|---|---|---|---|
| From | 9–28–83 | 9–28–83 | 9–28–83 |
| to | 4–26–84 | 4–26–84 | 4–26–84 |
| Insurance Companies liable | Northwestern North Star Lloyd's | Northwestern North Star Lloyd's | Northwestern North Star Lloyd's |

| Type of claim | PIP Claims | UM Claims | Liability Claims |
|---|---|---|---|
| From | 4–26–84 | 4–26–84 | 4–26–84 |
| To | 9–28–84 | 9–28–84 | 9–28–84 |
| Insur. Com liable | North Star Lloyd's | North Star Lloyd's | North Star Lloyd's |

Although the parties before the district court and before us addressed the various forms of insurance coverage and liability (Personal Injury Protection, Uninsured Motorist, and Liability Claims) separately, our discussion and our holding, like that of the district court, make no distinction between

(3) PUC's motion for summary judgment against North Star and Lloyd's was granted;

(4) Metro and Unsecured Creditors' motion for summary judgment against North Star and Lloyd's was granted;

(5) North Star's motion for summary judgment against Northwestern was granted in part, and denied in part, (Northwestern was held liable, *along with* North Star for claims dating from September 28, 1983 to April 26, 1984. Each sought to hold the other exclusively liable)

(6) North Star's cross-motion for summary judgment against PUC was denied;

(7) Lloyd's motion for summary judgment against Northwestern and North Star was granted in part, and denied in part (see 5, supra).

(8) Lloyd's cross-motion for summary judgment against PUC was denied;

The district court orders, which granted and denied in part motions made by the insurance companies, were designed to deny the insurance companies relief as against Metro, as well as to assign joint liability to the insurance companies without deciding which were primarily liable.

7. The district court in its opinion stated:

Therefore, it is this Court's determination that Northwestern is liable to Metro for dollar one coverage ($1 to $25,000) for automobile accident claims arising from September 28, 1983 through April 26, 1984

We observe, however, that at times throughout its opinion the district court referred to Northwestern's liability as extending only through *March 26,* 1984. This latter date obviously stems from Northwestern's attempt in March 1984 to cancel its 1982 policy retroactively. The date "March 26, 1984" has no relevance to the issues of this case. Therefore, we assume that the district court, in referring to March 26, 1984, intended to refer to April 26 1984.

8. As earlier noted, this appeal is only concerned with insurance coverage from the period of September 28, 1983 to September 28, 1984. The record does not disclose the particular insurance carriers or their respective or joint liability for any other period.

one type of coverage and another. Although minor differences appear in the Pennsylvania statutes pertaining to the various categories of insurance, the principles which we find controlling and which lead to our holding, apply equally as well to all types of insurance coverage at issue here.

## B.

■ Essentially our review relates to three legal issues:[9] (1) on March 28, 1984 did the PUC retroactively cancel Northwestern's Form E and insurance policy effective September 28, 1983? (2) Are the PUC regulations adopted in 1987, and which would allow for retroactive cancellation of policies applicable to this case? (3) What is the effect of the Pennsylvania insurance statutory scheme with respect to minimum insurance requirements where the policies of the various insurers have not provided such coverage?[10]

## IV

The validity of the purported retroactive cancellation on March 28, 1984 of Northwestern's policy and Form E—a policy whose term ran from September 28, 1982 to September 28, 1983—is central to this litigation.

Northwestern advances two legally distinct reasons why summary judgment on this issue should be granted in its favor. First, Northwestern argues that the retroactive cancellation by PUC was valid under Pennsylvania law in 1984 when it occurred. Second, Northwestern argues that even if the cancellation was improper at the time that it occurred, subsequent regulations adopted by the PUC, or the invocation of

PUC's inherent authority, can validate the March 26, 1984 cancellation as effective September 28, 1983. We reject these arguments.

## A.

Under Pennsylvania law each insurance company which provides coverage must file a Form E on the commencement date of its policy (in the case of Northwestern, September 28, 1982) which provides that the Form E

> may not be canceled without cancellation of the policy to which it is attached. Such cancellation may be effected by the Company or the insured giving thirty (30) days notice in writing to the State Commission, such thirty (30) days' notice to commence to run from the date notice is actually received in the office of the Commission.

■ Thus, Pennsylvania's law requires simultaneous cancellation of both the Form E and the policy, but such cancellation can only be given after thirty days notice is provided. Northwestern acceded to these provisions when it filed the Form E with its policy. Because no thirty day notice had been given prior to March 28, 1984, Northwestern's policy and Form E are deemed to remain effective through April 26, 1984—thirty days after Northwestern's notice was given.

Pennsylvania's insurance certification requirements were promulgated pursuant to PUC's authority to issue regulations for motor carriers "for the protection of persons or property of their patrons and the public." The purpose of the relevant statutory provisions[11] is to assure the public

---

9. Northwestern claims before us that there are outstanding factual issues left to be resolved as to whether Metro procured its insurance policy through fraud. The record does not reveal that this issue was raised in the district court. We therefore do not address it on appeal; See *Newark Stereotypers' Union No. 18, v. Newark Morning Ledger Co.,* 397 F.2d 594 (3d Cir.1968).

10. The concerns that have been raised before us involve Metro, PUC and the Unsecured Creditors on the one hand, and the insurance companies on the other. Because we have serious

question as to whether we have jurisdiction to decide claims or priority of payment solely between the insurance companies *inter se,* we will confine our discussion and holding to determining only the liability of the insurance companies to Metro. We note that the district court did not address or decide these issues.

11. 66 Pa.C.S.A. § 512 states:
§ 512. Power of commission to require insurance
The commission may, as to motor carriers, prescribe, by regulation or order, such re-

that an insurance carrier may not cancel its automobile coverage except on prior notice to the PUC. Thus, the public is guaranteed that all licensed taxis have the requisite insurance protection mandated by Pennsylvania.

Without a Form E, a common carrier could, in agreement with its insurance company, cancel its insurance policy before its expiration date, and thus leave third party accident victims without any source of insurance compensation; 17 *Couch on Insurance* 2d § 67:87, at 539 (1983). Consistent with this purpose, whenever a statute or insurance policy provides for a notice of cancellation, Pennsylvania law has mandated that an insurer's failure to comply with the provisions of the notice of cancellation results in the continuation of coverage under the policy regardless of any prescribed date of expiration. *Paul v. Dwyer*, 410 Pa. 229, 188 A.2d 753 (1963); *Levan v. Pottstown–Phoenixville Ry. C.*, 279 Pa. 381, 124 A. 89 (1924); *Scheel v. German American Insurance Co.*, 228 Pa. 44, 76 A. 507 (1910); *Royal Indem. Co. v. Adams*, 309 Pa.Super. 233, 455 A.2d 135, 142 (1983).

### B.

■ One of Northwestern's arguments to avoid liability coverage after September 28, 1983, was that it cannot, as a matter of law be held liable under its insurance contract from September 28, 1983 to April 26, 1984, since North Star had already filed a Form E which provided Metro with the required coverage from September 28, 1983 —the date on which Northwestern contends its policy was effectively canceled. To support this argument, Northwestern calls our attention to 52 Pa.Code § 32.2(f), which states:

> (f) Certificates of insurance ... which have been accepted by the Commission under this chapter may be replaced by other certificates of insurance.... and the liability of the retiring insurer ... under the certificates of insurance ... shall be considered as having terminated as of the effective date of the replacement certificate of insurance ...

The effect of this regulation would be to automatically retire Northwestern's policy and its Form E as of the commencement date of North Star's insurance coverage on September 28, 1983.

Whatever the merits of this argument, had the events here occurred subsequent to August 1, 1987, it cannot succeed where the relevant insurance coverage was written prior to the effective date of the regulation. Section 32.2(f) was adopted July 31, 1987, and became effective August 1, 1987 or more than three years after the events giving rise to the present controversy arose.

Northwestern attempts to overcome this answer to its argument by claiming that § 32.2 is purely procedural, and thus should be applied retroactively. Northwestern argues that regulations which concern procedure, and do not change or affect the rights of the litigants, operate retroactively. Moreover, Northwestern asserts that § 32.2 did no more than codify PUC's past practices, and in an attempt to clinch this point, refers to the title of the regulation "Insurance Forms and *Procedures.*" (Emphasis added.) Thus, Northwestern argues that as a strictly procedural regulation, § 32.2 should be applied to the present case.

We are impressed with PUC's reply that § 32.2 was developed to prospectively close the regulatory loopholes that had surfaced in the Metro insurance litigation during the preceding four years. The PUC argues that the regulations were intended only to prevent the type of problem encountered here, from recurrence in the future. PUC answers Northwestern's arguments by asserting that Northwestern issued its policy and filed its Form E fully aware of its legal obligations, including the obligation to provide 30 days notice prior to cancellation

quirements as it may deem necessary for the protection of persons or property of their patrons and the public, including the filing of surety bonds, the carrying of insurance, or the

qualifications and conditions under which such carriers may act as self-insurers with respect to such matters.

even if other insurance were to be provided.

While we are bound only by the pronouncements of a state's highest court, we have no occasion either to dispute, or fail to respect, the rule stated in *In re Starr,* 55 Pa.Cmwlth. 46, 423 A.2d 751, 753 (1980). In *Starr* the court stated Pennsylvania's rule to be:

> We agree with protestants as to the validity of the general proposition that a statute like 66 Pa.C.S. § 332(h) can operate retroactively because it concerns only the mode of procedure; *it does not change or affect any substantive rights of litigants.* See *Universal Cyclops v. Krawczynski,* 9 Pa.Cmwlth. 176, 305 A.2d 757 (1973).

(Emphasis added)

Thus, where mere procedural issues are involved, retroactive application may be in order. However, this rule refuses retroactive application of a regulation where the substantive rights of a litigant is affected. The difficulty with Northwestern's argument is that the district court found that a substantive right of a litigant would be invalidated if retroactive effect to Rule 32.2 was to be given. The district court stated:

> a retroactive application of 52 Pa.Code § 32.2 would be prejudicial to the parties and adversely affect the substantive rights of the litigants.

We agree. Any cancellation of Northwestern's policy which had the effect of canceling Northwestern's liability coverage retroactively to September 28, 1983 would necessarily eliminate a source of insurance funds for the third party claimants injured by a Metro taxicab. While Northwestern has directed our attention to a number of instances where Pennsylvania court's have retroactively applied procedural rules, we have been directed to no authority where Pennsylvania's regulations having an effect similar to the effect 52 Pa.Code § 32.2(f) would have in the present case, have been applied retroactively to deprive litigants of a right to recovery.

Because the district court did not err in declining to give retroactive effect to 52 Pa.Code § 32.2(f), we affirm its rejection of Northwestern's retroactive/procedural argument.

### C.

█ Northwestern additionally argues that PUC had the implied power to cancel insurance policies at any time. Northwestern predicates this argument on 66 Pa.C.S.A. § 510 which states that the PUC

> shall have full power and authority, and it shall be its duty to enforce, execute and carry out, by its regulations, orders or otherwise, all and singular, the provisions of this part ...

Based on this statute, Northwestern claims that "[o]ne of the implied and 'clearly necessary' powers implicit in this grant, is the PUC's right to reject, cancel, compile and maintain those filings. Therefore, when the PUC canceled Northwestern's Form E effective September 28, 1983, it acted within its power." (Northwestern brief at 89–2008, p. 20)

PUC on the other hand argues that it does not have inherent authority to cancel insurance. PUC states that it "does not have authority nor would it ever intend to amend or modify a certificate in a manner which alters the substantive rights of the continuing parties or the members of the public covered by a policy" (PUC brief at 89–2007/08/09, p. 17–18).

The district court accepted PUC's legal reasoning and held that:

> neither Mr. McCarthy, as an employee of the PUC, nor the PUC itself, had the authority to determine the contractual rights and obligations of the insurers. It was not within the discretion of the PUC to decide the commencement or termination of the respective insurance policies, the intent of the parties, dollar one or excess coverage, or the dates of coverage.

We agree.

█ In Pennsylvania, "the filings and all underlying insurance contracts speak for themselves." (See *In re Valmar,* 38 F.Supp. 618 (E.D.Pa.1941); *Scott v. Bryn Mawr Arms, Inc.,* 454 Pa. 304, 312 A.2d 592 (1973)). Additionally, Pennsylvania

case law makes it clear that no administrative agency can alter or modify any statute enacted by the Legislature; *Serefeas v. Nationwide Insurance Co.,* 338 Pa.Super. 587, 488 A.2d 48 (1985). Thus the district court correctly determined that, absent a specific statute or regulation to the contrary, no administrative agency in the Commonwealth had the authority to determine or modify the contractual rights of the insurers under their policies.

Accordingly, PUC did not cancel the Northwestern policy as of September 28, 1983 or waive the thirty day cancellation requirement when one of its employees on March 28, 1984 stamped the Northwestern policy with an effective cancellation date of September 28, 1983. We hold that the insurance policy issued by Northwestern remained in effect until 30 days after its notice of cancellation on March 28, 1984 or April 26, 1984.

## V

### A.

The next issue we confront is whether the various insurers (Northwestern, North Star and Lloyd's) have provided the minimum insurance required by Pennsylvania statute, and if they did not, which company, if any, was responsible for complying with the statutory minimum insurance coverage?

North Star and Lloyd's argue that the district court erred when it declined to hold that Metro had waived its right to first dollar coverage by acting as a self-insurer to the extent of the first $25,000 of each claim. On the other hand, Metro (along with PUC and the Unsecured Creditors) maintains, and the district court ruled, that while such a waiver was indeed executed,[12] it had no legal effect because Metro was not an approved "self-insurer." Absent such approval, Metro argues that its waiver was a nullity.

As we discuss *infra*, if the waiver had no effect, then under relevant Pennsylvania law, the insurance companies, in this case

North Star, Lloyd's and Northwestern, become liable for the first $25,000 of claims even though they sought no insurance premiums, were paid no premiums, and no such coverage was intended. The district court found, and it was not disputed, that Metro had not been approved as a "self-insurer" and hence had no status as a self-insurer under the laws of Pennsylvania.

### B.

▮ Pennsylvania law and PUC regulations establish specific requirements for insurance for all common carriers desiring to be licensed in the state of Pennsylvania. This mandatory coverage compensates injured third parties for their medical expenses, or any other loss caused by the common carrier.

In particular, 52 Pa.Code § 29.104 mandates that common carriers must have a minimum coverage of at least $25,000 per person and $100,000 per accident for bodily injury or death claims as well as $10,000 per accident coverage for property damage claims. However, under the Pennsylvania No–Fault Act (40 Pa.S.A. § 1009.101 *et seq.*) a common carrier is allowed to be a self-insurer if the common carrier meets certain financial standards and is approved as a self-insurer by the Insurance Commission and the Insurance Department. Approval by the Commissioner permits self-insured "coverage" which is the equivalent of a policy issued by an insurance company; *Modesta v. Southeastern Pennsylvania Transportation Authority,* 503 Pa. 437, 469 A.2d 1019 (1983).

Pennsylvania has been uniformly insistent that basic insurance coverage be required for all registered motor vehicles. In *Mitchell v. Travelers Insurance Company,* 372 Pa.Super. 105, 538 A.2d 1372, 1375–76 (1988), *aff'd,* 522 Pa. 545, 564 A.2d 1232 (1989) the Pennsylvania court stated that:

> these sections [40 Pa.S.A. § 1009.209(A) and 40 Pa.S.A. § 1009.104(A)] made it eminently clear that all motor vehicles

12. In a waiver dated March 19, 1984, Metro stated *to its insurers* that it was acting in the

capacity of a self-insurer regarding first dollar coverage.

registered in this Commonwealth, ... [are] required to carry insurance providing coverage for basic loss benefits. *By virtue of these statutory provisions, a contract providing coverage for basic loss benefits was imposed by law. The law [cannot be] overridden by the absence of a specific provision in the policy providing such coverage or the failure to collect an additional premium therefor.*

(Emphasis added.)

See also *Wilbert v. Harleysville Mutual Insurance Co.,* 254 Pa.Super. 217, 385 A.2d 987, 992 (1978); *Tubner v. State Farm Automobile Insurance Co.,* 496 Pa. 215, 436 A.2d 621 (1981).

If such coverage is not provided, it will be read into all insurance contracts.

## C.

Pennsylvania law has clear statutory provisions to deal with the issue of incomplete insurance coverage. With few exceptions not relevant here, the Uninsured Motorist Act (40 Pa.S.A. § 2000 *et seq.*) forbids an insurer to issue any motor vehicle liability policies unless the required uninsured motorist coverage is provided; *Patrick v. Cherokee Ins. Co.,* 354 Pa.Super. 427, 512 A.2d 24 (1986). In the present case because Metro is a common carrier the statutes under which Metro and its insurers operate require a minimum coverage and further require that any insurer providing any coverage must also guarantee first dollar coverage if that coverage is not otherwise provided. To this extent the Pennsylvania legislative scheme "trumps"

policy provisions and coverage which might ordinarily limit an insurance company's exposure and liability to the insurance policy's coverage for which premiums were collected.[13] Thus, Pennsylvania places the burden on every insurance company to ensure that *all* insurance required by law is actually in place.

In summary, if Metro was not a valid self-insurer, then the minimum required insurance had to be provided solely within the coverage of the policies issued by the insurance companies. If such coverage was not provided, it will be, under *Mitchell, Wilbert* and *Tubner,* imputed to each of the remaining valid insurance contracts—in this case to Northwestern, North Star and Lloyd's insurance policies. On the other hand, if Metro was a valid self-insurer, then the combination of Metro's self-insurance and the policies issued by Northwestern, North Star and Lloyd's must provide the minimum insurance required by law.

As earlier noted, in essence, the district court found that Metro had to waive "dollar one" insurance company coverage in order to act as an approved self-insurer.[14] This conduct was not only in violation of the insurance regulations of the state of Pennsylvania but under the holding of *Mitchell,* required that the missing coverage be read into the contracts for insurance issued by the insurance companies.

## D.

The essence of the insurance companies' argument is that Metro, even though not a valid "self-insurer" under the statute was

**13.** 40 Pa.S.A. § 1009.209 states:
　(a) Included coverage.—A contract of insurance covering liability arising out of the ownership, maintenance, or use of a motor vehicle registered in this Commonwealth, shall include basic loss benefits and any other benefit coverage required by the no-fault plan for motor vehicle insurance in effect in this Commonwealth unless such contract provides tort liability coverage only in excess of any of those required by the no-fault plan.

**14.** We reject North Star and Lloyd's argument that the contract is unclear as to what extent each company accepted liability. As the district court stated:

[The insurance companies' own] actions have now created an ambiguity as to the rights and responsibilities of the insurers. Although "[a] court is not authorized to construe a contract in such a way as to modify the plain meaning of its words ..." "where ambiguities are contained in an insurance policy, the Pennsylvania 'rule' requires that they be construed in favor of the insured." The interpretations of insurance contracts, in general, are "designed to promote coverage and to fulfill the dominant purpose of providing indemnification. In a word, ... to maximize coverage for the insured."
(citations omitted)

still authorized to assume its own coverage for the first $25,000 claimed. They refer us to *Jones v. Travelers Insurance Co.,* 356 Pa.Super. 213, 514 A.2d 576, 580 (1986) where the court stated:

The Uninsured Motorist Act therefore delineates three categories of common carriers: 1) those who like SEPTA are authorized to self-insure for all their liability needs; 2) those who accept uninsured motorist coverage in their policies of insurance and pay the premiums for it; and 3) those who reject uninsured motorist coverage in their insurance policies. Appellant Jones argues that when a common carrier rejects uninsured motorist coverage it is not obligated to provide the benefits required of all other common carriers....

We cannot accept appellant's interpretation of the Uninsured Motorist Act. The Act does not state that a common carrier that rejects uninsured motorist coverage is relieved of the responsibility borne by all other motor vehicle owners in Pennsylvania, whether insured or self-insured, of providing for uninsured motorist benefits. The statute merely provides that a common carrier need not purchase uninsured motorist coverage as part of its automobile liability policy; i.e., the common carrier may be self-insured.

The insurance companies argue that by its use of three categories, the *Jones* court implied that a carrier can reject uninsured motorist coverage even if the carrier is not an approved self-insurer.

A careful analysis of *Jones* does not support this reading. The *Jones* court did no more than explain the three different ways common carriers can acquire coverage. They are:

1] Those organizations, like SEPTA, that the legislature explicitly stated are to be considered self insurers;

2] Those who purchase coverage;

3] Those groups *who qualify as self-insurers,* but who are not explicitly recognized as such by the legislature, such as any common carrier that has the resources to qualify as "self-insured."

Thus, Metro was not an authorized self-insurer under category three, and could only become a self-insurer by obtaining the requisite approval from the Insurance Commissioner.

This understanding of *Jones* is bolstered by the *Jones* court's comment in note 8. Footnote 8 states:

The No-fault Act makes insurance mandatory for all owners of motor vehicles, *but allows self-insurance subject to the approval of the insurance commissioner. See 40 P.S. § 1009.104(a)(b).* Similarly, as the court in *Modesta* observed, the Legislature granted SEPTA the authority to self-insure. 503 Pa. at 441 n. 2, 469 A.2d at 1022 n. 2. As a common carrier Yellow Cab may also self-insure if it meets the criteria established by the Public Utility Commission. 52 Pa.Code § 29.104(d).

(Emphasis added.) When the *Jones* court stated in the text of its opinion that one category of common carriers who need not insure with an insurance company is the category of "those who reject uninsured motorist coverage in their insurance policies," that comment cannot be read to mean that a common carrier may operate without either self-insurance or an insurance policy. One or the other is required. If the carrier can meet the necessary qualifications, *i.e.* approval by the Insurance Commission, it may self-insure. The *Jones* court meant to limit any exceptions (as it did in footnote 8) to those self-insured carriers who are approved by the Insurance Commission. Metro, however, had not received such approval.

It was this analysis that compelled the district court to assign liability for first dollar coverage to North Star and Lloyd's (and until April 26, 1984, Northwestern), even though their respective policies did not provide such coverage. The district court stated that:

with the full participation of its insurers, North Star and [Lloyd's], Metro was allowed to waive policy coverage in order to act as an unauthorized self-insurer and thereby circumvent the applicable laws and regulations. North Star and

[Lloyd's] accepted this waiver and drafted insurance policies that would allow Metro to maintain an unauthorized $1 to $25,000 self-insurer retention . . .

(citations omitted).

In its denial of the insurance companies' motions for reconsideration, the district court once again explained its reasoning. The district court stated:

> Every policy of basic loss insurance issued in Pennsylvania must include all coverage mandated by the No–Fault Act "and by the Insurance Department Regulations validly promulgated thereunder." The pertinent regulation, Insurance Department Regulation 66.11, requires motor vehicle insurance policies to provide, in addition to the coverage required under the No–Fault Act, uninsured motorist coverage in limits of $15,000 per person, $30,000 per accident. 31 Pa.Code § 66.11 (since changed). Pennsylvania law imposes primary responsibility for compensating the claimant on the insurer. The insurer is responsible as a matter of law for the provision of no-fault benefits regardless of the contents of the particular insurance policy or the actions or failure to act of the insured. It is well established that the substantive laws in effect when a contract is entered into become part of the obligation of contract with the same effect as if expressly incorporated in its terms.

(Citations omitted.)

North Star and Lloyd's in their 1983 Form E filing (and Northwestern in its 1982 Form E filing) certified to PUC that it had provided Metro with insurance in full compliance with Pennsylvania's laws. The Form E which was filed stated:

> This is to certify that [insurance company] of [location] has issued to Metro Transportation Co. trading as Yellow Cab Co. of 105 12th Street, Philadelphia PA 19107 a policy or policies of insurance effective from 9/28/82, 1201 a.m. standard time at the address of the insured stated in said policy or policies and continuing until canceled as provided herein, which by attachment of the Uniform Motor Carrier Bodily Injury and Property Damage Liability Insurance Endorsement, has or have been amended to provide automobile bodily injury and property damage insurance covering the obligations imposed under such motor carrier by the provisions of the motor carrier law of the State in which the Commission has jurisdiction or regulations promulgated in accordance therewith. . . .

It now appears that despite the Form E certification, Metro had not been approved as a valid self-insurer and that accordingly no "dollar one" insurance coverage had been provided by Metro. As we explained above, Pennsylvania case law places the risk of this type of mis-certification on the insurance companies that file Form E's, rather than on innocent third parties who have been injured; *Jones*, 514 A.2d at 580. This being so, the insurance companies must bear the liability for "dollar one" insurance coverage which Metro had, as a self-insurer sought, but failed to provide.

## VI

■ Lloyd's, unlike both Northwestern and North Star, advanced an alternative argument to avoid liability for "dollar one" coverage. Lloyd's concedes the requirement for "dollar one" coverage by the insurance companies generally, but argues that Lloyd's specifically is not liable, since Lloyd's did not itself file a Form E with PUC. While it is not disputed that Lloyd's did not file a Form E itself, the record reveals that North Star's and Lloyd's policies were offered to Metro as a "package" deal (Appendix 241). Indeed, the agent for both companies was the same. Having sustained the district court determination that North Star was liable for "dollar one" coverage from September 28, 1983 through September 28, 1984 even though the Form E filed by North Star was not filed until March 27, 1984, Lloyd's, as a co-insurer of Metro under the "package" of policies which were issued by North Star and Lloyd's, has the same obligation imposed upon it under Pennsylvania law as North Star has.

Had Metro been a valid self-insurer at the time that North Star and Lloyd's issued their policies, and had Metro's status changed only after the insurance had been issued, Lloyd's claim might have had merit. However such was not the case. Rather, at the time that North Star and Lloyd's issued their policies to Metro none of the insurance companies with which Metro had contracted provided for "dollar one" coverage; see text of district court opinion quoted at page 687 *supra*. We agree with the district court that Lloyd's cannot escape from its obligation to provide "dollar one" coverage where Metro, the purported self-insurer, had not been approved by PUC.

Nor can Lloyd's attempted distinction between the insurer who issues the policy [Lloyd's] and the insurer who certifies the Form E [North Star], be found in Pennsylvania law. The thrust of the controlling statute (40 Pa.S.A. § 1009.209) which speaks in terms of "[a] contract of insurance" provides to the contrary, stating:

> (a) Included coverage.—A *contract of insurance* covering liability arising out of the ownership, maintenance, or use of a motor vehicle registered in this Commonwealth, shall include basic loss benefits and any other benefit coverage required by the no-fault plan for motor vehicle insurance in effect in this Commonwealth unless such contract provides tort liability coverage only in excess of any of those required by the no-fault plan.

(Emphasis added)

In *Mitchell v. Travelers Insurance Company*, 372 Pa.Super. 105, 538 A.2d 1372, 75–76 (1988) the court, while explaining the above section, stated: "a contract providing coverage for basic loss benefits was imposed by law. The law was not overridden by the absence of a specific provision in the policy providing such coverage...."

Neither the statutes nor the case law distinguish between the insurance company that certifies the Form E and a company that merely issues the policy. Further-

more, no precedent authorizing such a distinction has been called to our attention.

We thus reject Lloyd's alternative claim and hold that Lloyd's is liable for "dollar one" coverage just as we have held Northwestern and North Star to be liable.[15]

### VII

We have held among other holdings, that Metro, as a common carrier which had failed to provide "dollar one" insurance coverage as a purported self-insurer, had to have been approved by the PUC as a self-insurer if any and all insurance carriers providing coverage beyond the self-insured limit were to be relieved of "dollar one" coverage. See *Jones*, 514 A.2d at 580.

We have held that failure by the purported self-insurer to obtain PUC approval imposes the burden of "dollar one" coverage on any and all insurance companies with which Metro had contracted for insurance. See *Mitchell*, 538 A.2d at 1375–76.

We have held that the arguments advanced by Metro's insurers (Northwestern, North Star and Lloyd's) which depend upon the excess nature of their particular policies or the particular provisions in their insurance contracts, are all subject to the mandatory coverage provisions of Pennsylvania's law.

We have held that PUC had no authority to cancel Northwestern's Form E retroactively and that by failing to cancel its policy and Form E in a timely manner, Northwestern must be held to "dollar one" coverage until April 26, 1984, the effective date of its cancellation.

We have held that under the relevant Pennsylvania statutes and regulations, Northwestern's liability coverage continued even after North Star's liability commenced. Thus, we have held Northwestern, North Star and Lloyd's liable for "dollar one" coverage at the relevant times discussed in this opinion.

Therefore, we will affirm the July 7, 1989 order of the district court which as-

---

**15.** As earlier noted, we need not address the priority of liability of any of the three insurance companies *inter se*. These issues were not de-

cided by the district court and are not involved on this appeal.

signed liability to the insurance companies as follows:

1) From September 28, 1983 to April 26, 1984,[16] Northwestern, North Star and Rokeby–Johnson (Lloyd's) are liable for the first $25,000 worth of coverage for Personal Injury Protection (PIP), Uninsured Motorist claims (UM) and Liability Claims.

2) From April 26, 1984 to September 28, 1984 only North Star and Rokeby–Johnson are liable.